UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
JAMAL WILLIAMS,,

                Plaintiff,

    - against -

                            **COMPLAINT**

CITY OF NEW YORK, AARON
JOHNSON, and JOHN DOES 1-5,

                Defendants.
------------------------------X

    Plaintiff, Jamal Williams, by his attorneys, Lumer & Neville, hereby alleges upon information and belief as follows:

### PARTIES, VENUE, and JURISDICTION

    1. At all times hereinafter mentioned, plaintiff Jamal Williams was an adult male resident of New York County, in the State of New York.

    2. At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including but not limited to, the New York City Police Department ("NYPD") and its employees.

    3. At all relevant times hereinafter mentioned, defendant Aaron Johnson (Tax No. 935072) was employed by the City of New York as a member of the NYPD. Johnson is sued herein in his individual capacity.

    4. At all relevant times hereinafter mentioned, defendants John Does 1-5 were employed by New York City as members of the NYPD. While John Does participated

in plaintiff's unlawful arrest and detention, and caused or otherwise failed to intervene to limit or prevent the constitutional injuries alleged herein by plaintiff, their identities are not presently not known. The John Does are sued herein in their individual capacity.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

6. Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Southern District of New York, where plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

## RELEVANT FACTS

7. As of November 18, 2015, plaintiff resided in an apartment on Avenue C in New York County (the "premises").

8. As of November 18, 2015, Andrew Hudson also resided in the premises.

9. Plaintiff and Hudson each had their own separate bedrooms.

10. During the early morning hours of November 18, 2015, members of the NYPD, including Johnson and at least some of the Doe defendants forcibly entered the premises.

11. The defendants did not have consent to enter the premises and there were no exigent circumstances that would permit defendants to enter the premises.

12. The defendants have claimed to have a lawful search warrant for the

premises but failed to produce it.

13. Plaintff was present in his bedroom when the defendants entered the premises.

14. Upon information and belief, Hudson was present in his bedroom when the defendants entered the premises.

15. One or more defendants entered plaintiff's bedroom with guns drawn and pointing at plaintiff's face.

16. Plaintiff and Hudson were both seized and handcuffed.

17. Upon information and belief, a female overnight guest staying in Hudson's bedroom was also seized and handcuffed.

18. There was no contraband of any sort in plaintiff's bedroom nor was there any such contraband in any of the common areas of the premises.

19. The defendants have claimed that they recovered a handgun and ammunition from a backpack that was in Hudson's bedroom, as well as a plastic bag containing marijuana that was also found in Hudson's bedroom.

20. Defendant Johnson has also claimed that he found approximately one pound of marijuana inside a plastic bag in the living room.

21. Defendant Johnson's claim to have recovered marijuana in the living room was false.

22. To the extent that any weapons, marijuana, or other contraband was found, it was recovered inside Hudson's bedroom.

3

23. Despite the absence of any probable cause for plaintiff's arrest, defendants continued to hold him in handcuffs and then transported him to a local area NYPD service area or station house, where plaintiff was jailed for a period of hours.

24. Plaintiff was subsequently transported to Central Booking, where he was further imprisoned for a period of time.

25. While plaintiff was imprisoned by the defendants, Johnson and/or one or more of the Doe defendants completed arrest paperwork in which they falsely claimed that plaintiff possessed the handgun and marijuana that they claimed to have found in Hudson's room, as well as the marijuana the defendants falsely claimed to have found in the living room.

26. Johnson and/or one or more of the Doe Defendants forwarded these false allegations to the New York County District Attorney's Office ("NYDA") in order to justify plaintiff's arrest and persuade the NYDA to initiate plaintiff's criminal prosecution.

27. Defendants knew and understood that the NYDA, in evaluating whether to commence a criminal prosecution against the plaintiff, was relying on the truthfulness of their allegations.

28. These allegations were materially false, and the individual defendants knew them to be false at the time they were made.

29. The individual defendants made these fabricated, false, and otherwise misleading claims and accusations at the time of plaintiff's initial arrest and continuously throughout the course of plaintiff's criminal prosecution.

4

30. On November 19, 2015, plaintiff was arraigned under docket number 2015NY075012 and charged with multiple counts of criminal possession of a weapon and one count of marijuana possession.

31. The plaintiff's prosecution continued thereafter and plaintiff was required under threat of imprisonment to return to court on multiple occasions.

32. On June 16, 2016, the criminal case against Jamal Williams was dismissed and the prosecution terminated in plaintiff's favor.

33. At no time did defendants have sufficient legal cause to either enter the premises, or to seize, arrest, and detain plaintiff, nor was it reasonable for defendants to believe that such cause existed.

34. To the extent that any of the individual defendants did not directly engage or participate in the above-mentioned misconduct and/or fabrication of evidence against plaintiff, at no time did such defendant take any steps to intervene in plaintiff's arrest or continued detention in defendants' custody, despite ample opportunity to do so, nor did such defendant file any corrective statement or make any effort of any sort to correct the false statements he knew his fellow officers had fabricated and communicated to the NYDA, or otherwise protect plaintiff from further harm caused by his/her fellow officers' knowing and deliberate violation of plaintiff's constitutional rights.

35. At all times relevant herein, each of the individual defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

(42 U.S.C. § 1983 Claims
Against the Individual Defendants)

36. Plaintiff repeats the above-stated allegations as though stated fully herein.

37. Defendants, individually and collectively, willfully and intentionally entered and searched plaintiff's premises, and then seized, arrested, and caused plaintiff to be imprisoned without probable cause, or any reasonable basis to believe probable cause existed, or otherwise failed to intervene while their fellow officers engaged in this unconstitutional conduct.

38. The individual defendants fabricated and withheld evidence, and misled prosecutors in order to manufacture probable cause for the plaintiff's arrest and continued imprisonment, or otherwise failed to intercede with the NYDA in order to limit or prevent the unlawful arrest, confinement, and prosecution of plaintiff caused by their fellow officers' unconstitutional conduct.

39. By so doing, the individual defendants, individually and collectively, subjected plaintiff to (i) the unlawful entry and search of his residence; (ii) false arrest and imprisonment; (iii) denial of due process and the right to a fair trial, and (iv) malicious prosecution; thereby violating, or at least aiding and abetting in the violation of, plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

40. To the extent that any of the individual defendants did not directly

6

engage in this unconstitutional conduct, such defendant officer was aware of such conduct by his/her fellow officers but consciously abjectly failed to intervene or otherwise put a stop to the aforementioned misconduct and violation of plaintiff's constitutional rights, by remaining silent or otherwise deliberately choosing not to take any meaningful steps to correct his fellow officers' misconduct, despite an ample opportunity to do so..

41. By reason thereof, the individual defendants have violated 42 U.S.C. § 1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, imprisonment and the deprivation of liberty, as well as the loss of her constitutional rights.

## SECOND CAUSE OF ACTION

(First 42 USC § 1983 Claim Against the Municipal Defendant)

42. Plaintiff repeats the preceding allegations as though stated fully herein.

43. The individual defendants' false arrest of plaintiff, as well as their fabrication of evidence against plaintiff to justify their unconstitutional conduct, and their failure to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow defendants, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

44. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

45. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search

warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

46. The NYPD tracks the number of arrests made by each officer but, in evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

47. More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

48. The purpose of this policy or plan was to generate large numbers of arrests within the individual commands therein, in order to create a false or misleading impression of positive activity by their officers and satisfying internal quotas.

49. In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, summonses issued, and other, similar criteria. Members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity"

and improve the perception of their job performance.

50. Upon information, this policy was in existence as of November 18, 2015, as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which then-NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

51. Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage m proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

52. In the case of *Floyd v City of New York*, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in *Floyd*, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and a labor grievance on behalf of six officers and one sergeant who were transferred out of the same 75 precinct where plaintiff was arrested for allegedly failing to meet a ten summons-per-month quota. In January 2006, a labor arbitrator found that this same 75 precinct had imposed summons quotas on its officers in violation of New York State labor laws.

53. In another Southern District of New York case, *Schoolcraft v. City of New York*, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

54. In 2012, Police Officer Craig Matthews commenced *Matthews v. City of New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and thereby causing damage to the department's relationship with the local community led to his termination. There was little dispute that he made these complaints or that they were well founded. *See Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

55. That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

56. The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the

prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

57. The City and NYPD are well aware of the thousands upon thousands of allegations of misconduct by its officers with respect to their abuse of their authority to arrest, and the casual and common manner in which many of these officers lied in their arrest paperwork, lied to prosecutors, lied to judges, and lied to juries, without regard to the rights of the people they arrested and caused to be prosecuted, and without any concern for the larger damage done to the Constitution and the people these officers are meant to serve.

58. According to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD had risen from $99 million to $217 million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015 report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which can be attributed to a strict quota policy that compelled officers to focus on the quantity of their arrests at the expense of making good arrests.

59. In October 2011, following a criminal bench trial in New York

Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports. Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

60. In an Order dated November 25, 2009, in *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

61. It is thus manifestly clear through the litigation brought in the Eastern and Southern Districts of New York, as well as the many cases filed in New York's State courts, that thousands of civilians have alleged that members of the NYPD have deliberately arrested them without probable cause. Thus, even if the municipal defendant was not the architect of the policies and routinized conduct causing these unlawful arrests, it was

12

certainly on notice of the practice, and by failing to take any meaningful corrective steps, has ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it employs.

62. Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders.

63. The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City of New York and the NYPD's executive leaders and supervisory personnel.

64. It is therefore clear that the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York,

13

at the bare minimum, has been on notice of, and remained deliberately indifferent to, the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a decidedly and deliberately indifferent level of supervision, would lead to the violation of individuals' constitutional rights in general, and the violation of plaintiff's rights in particular.

65. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

### THIRD CAUSE OF ACTION

(Second 42 USC § 1983 Claim Against the Municipal Defendant)

66. Plaintiff repeats the preceding allegations as though stated fully herein.

67. Members of the Narcotics Division are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the Narcotics Division routinely make arrests and engage in other police activity often without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

68. The NYPD generally, and Narcotics Division in particular, tracks the number of arrests made by each officer but does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, members of the Narcotics Division are well aware that (a) they are being evaluated based on, in large part, the

number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

69. More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

70. Towards that end, there is a policy within the Narcotics Division, that when a search warrant is executed in a residential location and any contraband is claimed to have been recovered at that location, every adult person found in those premises is arrested and charged with the possession of that contraband, regardless of the circumstances surrounding the finding or location of the contraband or the relationship of each individual to the premises and/or the contraband and/or the other persons therein.

71. One purpose of this policy or plan was to generate larger numbers of arrests by each narcotics team, and thus improve the performance numbers and activity levels attributable to the team, the module to which they belong, and the Narcotics Division more generally.

72. Another purpose of this policy or plan was to inflate the success of each warrant's execution, so as to artificially inflate the value and reliability of the confidential informants utilized in search warrant applications.

15

73.  Many of these arrests lead to prosecutions that are subsequently dismissed by local prosecutors, while on many other occasions, prosecutors decline to file charges in the first instance.

74.  The City, the NYPD, and members of the Narcotics Division, are well aware that many of these bulk arrests made incident to search warrant executions do not result in convictions.

75.  Notwithstanding this knowledge, the City makes no effort to calculate the precise numbers of cases that do not result in convictions or those for which prosecutions are declined.

76.  In evaluating the performance of its Narcotics officers, the NYPD takes into account the number of arrests each member makes, with the view that more arrests are a positive indicator of activity, and do so without regard for how many of these arrests were actually prosecuted or the outcomes of these prosecutions.

77.  The impact of this policy is to reward Narcotics officers for making wholesale numbers of arrests, without any concern or regard for whether these arrests were grounded in probable cause or otherwise appropriate.

78.  The fact that many of the people wrongly arrested or maliciously prosecuted or denied their right to a fair trial bring lawsuits is of no concern to the NYPD, who do not take lawsuits, CCRB complaints, or similar investigations or suggestions of similar misconduct, into account when evaluating Narcotics officers.

79.  As a result of this policy, individuals present in locations where search

16

warrants are being executed are subject to arrest, regardless of whether probable cause for their arrest exists.

80. As a result of this policy, Narcotics officers too often fabricate evidence or mislead prosecutors with respect to the arrest of individuals who are arrested in such locations in order to justify an otherwise unlawful arrest.

81. This policy and practice is the proximate cause of the violation of many individuals' rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, including the plaintiff in this action.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, the plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

**[Remainder of Page Intentionally Blank]**

WHEREFORE, plaintiff demands judgment against defendants jointly and severally as follows:

    i. Actual and punitive damages against each of the individual defendants in an amount to be determined at trial;

    ii. Actual damages against the municipal defendant in an amount to be determined at trial;

    iii. Statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, as well as disbursements, and costs of the action; and

    iv. Such other relief as the Court deems just and proper.

Dated: New York, New York
March 26, 2017

LUMER & NEVILLE
Attorneys for Plaintiff
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060

_____
Michael B. Lumer (ML-1947)